[Cite as *State v. Bailey*, 2014-Ohio-4684.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 100993**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## EDWIN R. BAILEY, II

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-574053-A

**BEFORE:** E.T. Gallagher, J., Keough, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** October 23, 2014

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
Rick L. Ferrara, Esq.
2077 East 4th Street, 2nd Floor
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Erica Barnhill
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant, Edwin R. Bailey, II ("Bailey"), appeals his convictions and sentence. We find no merit to the appeal and affirm Bailey's convictions.

{¶2} Bailey was charged with two counts each of aggravated burglary, aggravated robbery, kidnapping, felonious assault, and theft. He was also charged with possessing criminal tools, having a weapon while under disability, and tampering with evidence. All the violent offenses included one- and three-year firearm specifications. The theft and possession of criminal tools charges included forfeiture specifications.

{¶3} The victims, James Byrge ("Byrge") and Melissa England ("England"), were robbed at gunpoint in their home on the night of May 1, 2013. Byrge and England are not married but live as a married couple and have two sons. Byrge owns and operates a pizza shop and owns several rental properties. On the day of the robbery, Byrge collected rent checks from tenants, all the cash from the restaurant, and returned home with his son shortly before midnight. Byrge carried the cash in a paper bag and his son carried a black bag into the house. Byrge's son went immediately to the basement to shower while Byrge placed the bag of cash and checks on the kitchen counter and prepared to relax in the hot tub in the backyard.

{¶4} Byrge testified at trial that as he approached the hot tub, a man appeared from the rear of the home wearing a black mask, gray hooded sweatshirt, and gloves. Byrge exchanged words with the masked man, who was holding a silver pistol. England heard

the confrontation and stepped outside the back door to see what was happening. The man with the pistol ordered both Byrge and England into the house.

{¶5} When they entered the home, another man appeared from outside the house with a rifle. He was also wearing a mask, gloves, and a darker colored gray hooded sweatshirt. The men ordered Byrge to get down on his knees and England to lie down on the kitchen floor face down. They demanded: "Where's the money?" Byrge told him it was on the kitchen counter, but the men stated that it was not enough. England testified that she witnessed one of the men strike Byrge with the barrel of his rifle, and the other man, who was wearing white Nike Air Jordan shoes, kick him in the head. The men demanded the black bag they had seen Byrge's son bring into the house. Byrge replied, "What black bag?" and then remembered that his son carried in a black bag containing rags and T-shirts from the restaurant.

{¶6} To appease his captors, Byrge told them he had more money in the bedroom. The gunman wearing the dark gray hooded sweatshirt followed Byrge to the bedroom where he took $2,400 from a dresser drawer. The other gunman restrained England in the kitchen at gunpoint. After collecting over $7,000 in the home, the men bound England's hands together with plastic zip strips. They were unable to bind Byrge's hands because his wrists were too large. Therefore, they attempted to place Byrge in a closet and threatened to kill England if he did not comply. However, because Byrge could not fit inside the closet, he complied by standing by the closet door. The men took the victims' car keys and cell phones before leaving the house. The victims maintained

infrared surveillance cameras on the outside of their home that captured the intruders on film. According to the surveillance video, the intruders were inside the victims' home for six minutes.

{¶7} As soon as the men were gone, Byrge cut England's restraints, ran outside, and observed the men running southbound through the yards to the next street over, which was Monterey Avenue. England called 911, and Byrge gave police a description of the suspects' build, clothing, and skin color. Byrge testified that he could see suspect's skin color through the eye openings in their masks. Within 15 minutes of the 911 call, Euclid police had set up a perimeter around the victims' home in an effort to find the gunmen.

{¶8} Officer Jeffrey Krysiak ("Krysiak") and Officer Franco Gianfagna ("Gianfagna") were parked on Monterey Avenue and observed three suspects matching the victims' descriptions walk down a driveway and enter a white Toyota Corolla. A fourth individual entered a dark car and drove away in the opposite direction of the Corolla. One of the officers entered the license plate number on the Corolla into the Mobile Data Terminal and discovered the car was owned by a rental company.

{¶9} After following the Corolla a short distance, the officers conducted a routine traffic stop. Gianfagna testified that as he approached the Corolla, he observed the backseat passenger, later identified as Bailey, stuffing papers between the seats. The papers were later identified as rent checks belonging to Byrge. Police ordered the three suspects, who identified themselves as Bailey, Rawshee Kellum ("Kellum"), and Davion Mack ("Mack"), out of the car. Gianfagna testified that he found a pair of gloves in the

backseat of the Corolloa where Bailey had been sitting. The officers also found $1,000 in Bailey's pocket, $3,290 on Kellum's person, and $861 on the third suspect, Davion Mack. Bailey was arrested pursuant to an outstanding warrant on an unrelated matter.

{¶10} Meanwhile, another officer transported Byrge to the scene to identify the suspects. Byrge noticed that one of the suspects, Kellum, was wearing white Nike Air Jordan shoes identical to those worn by one of the gunmen. Byrge's identification of the robbers was also based on their height, weight, and clothing.

{¶11} Officer Mickey Atchley ("Atchley") transported Bailey to the station. Euclid police cruisers are equipped with audio and video recording devices in the interior of each vehicle to protect both officers and suspects. After delivering Bailey to officers at the station, Atchley searched the back seat of the car as part of his regular routine and found a mask underneath the passenger's seat. Atchley reviewed the film of the interior video camera and observed Bailey attempting to hide something under the seat. Atchley further testified that he searched the vehicle before his shift according to routine procedure to ensure there was nothing back there before the arrest.

{¶12} Later that night, Krysiak returned to the house on Monterey Avenue where he had seen the suspects walking down the driveway. He found a ski mask on the step of the side door. Pursuant to a search warrant, police searched the home and found a silver pistol and a rifle in the basement. A forensic DNA scientist at the Ohio Bureau of Criminal Investigation testified that DNA found on the barrel of the rifle matched Byrge's DNA. DNA found on the ski mask recovered from the door step matched Bailey's

DNA, and the mask Bailey hid under the seat in the police car matched Mack's DNA. The next day, police recovered the four stolen cell phones from the backyard of the house on Monterey Avenue.

{¶13} The jury found Bailey guilty on all counts, and the court imposed an aggregate 24-year sentence. Bailey now appeals and raises four assignments of error.

## Sufficiency and Manifest Weight

{¶14} In the first assignment of error, Bailey argues there was insufficient identifying information to prove, beyond a reasonable doubt, that he was one of the individuals who burglarized Byrge and England's home. In the second assignment of error, Bailey argues the identification of Bailey was against the manifest weight of the evidence. Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these assigned errors together because they are closely related, while applying the distinct standards of review to Bailey's arguments. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶15} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶16} In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *Thompkins* at 387. While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶17} Bailey contends the evidence of his DNA on one of the masks was not a reliable method to identify him as the wearer of the mask because it was known that he touched the mask when he hid it under the seat in the police car. He argues that because the mask came into contact with his skin, the mask could contain his "touch DNA," and if that was the case, it would not prove that he wore the mask during the commission of the crimes. However, as previously stated, the mask Bailey attempted to conceal contained Mack's DNA. (Tr. 602.) Police found the mask containing Bailey's DNA on the step of the house on Monterey Avenue, where it was collected as evidence. (Tr. 536.)

**{¶18}** Morever, the mask was merely one of many pieces of circumstantial evidence used to prove Bailey's guilt. Byrge identified Bailey as one of the robbers within minutes of the robbery. Police officers had observed Bailey leaving the house on Monterey Avenue shortly after the robbery with Kellum, whom Byrge identified as one of the robbers by his white Air Jordan tennis shoes. When police searched the house, they recovered a silver pistol and a rifle that matched the victims' descriptions and the images of the suspects in their surveillance video. Further testing revealed the presence of Byrge's DNA on the end of the rifle, which was consistent with England's testimony that she witnessed one of the robbers hit Burge with a rifle. Police also recovered the victims' cell phones from a garbage can at the Monterey home.

**{¶19}** Police stopped the suspects' white Corolla within 15 minutes of the 911 call. As police approached the vehicle, they observed Bailey attempting to hide Byrge's rent checks in between the back seats. When Bailey exited the car, police noticed he had been sitting on a pair of gloves next to a gray hooded sweatshirt. The hooded sweatshirt and gloves were consistent with Byrge's description of the suspect's clothing. Moreover, police recovered a mask containing Bailey's DNA at the house on Monterey Avenue where they found the rifle containing Byrge's DNA. After Bailey was arrested, he attempted to conceal a black mask, later found to contain Mack's DNA, under the passenger seat of the police car. This act of concealment, along with all the other circumstantial evidence linking Bailey to the crime, is probative of Bailey's guilt.

**{¶20}** Therefore, there was sufficient evidence to identify Bailey as one of the robbers, and Bailey's convictions are sustained by the weight of the evidence.

**{¶21}** The first and second assignments of error are overruled.

### Allied Offenses

**{¶22}** In the third assignment of error, Bailey argues the trial court erred in failing to merge allied offenses of similar import as defined by R.C. 2941.25. He contends (1) the kidnapping counts should have merged with the aggravated robbery counts, (2) the aggravated robbery counts should have merged with the felonious assault counts, and (3) the aggravated robbery counts should have merged with the aggravated burglary counts.

**{¶23}** "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 23. Under R.C. 2941.25(A), when the same conduct by the defendant "can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However, R.C. 2941.25(B) provides that a defendant may nevertheless be convicted of two or more allied offenses of similar import if the offenses were committed "separately or with a separate animus as to each."

**{¶24}** In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Ohio Supreme Court established a two-pronged test to determine whether multiple offenses are allied offenses of similar import under R.C. 2941.25(A). *Id*. at ¶ 48. First, the court must examine "whether it is possible to commit one offense and commit the other with the same conduct." If the answer is yes, the court must determine "whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id*. at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 50 (Lanzinger, J., dissenting).

**{¶25}** An appellate court applies a de novo standard of review when it reviews the legal conclusion of whether the offenses are allied. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 30. When deciding whether multiple offenses should have merged, the reviewing "court must review the entire record, including arguments and information presented at the sentencing hearing, to determine whether the offenses were committed separately or with a separate animus." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, syllabus.

**{¶26}** In this case, the trial court merged Count 2 into Counts 7 and 8. Count 2 alleged aggravated burglary in violation of R.C. 2911.11(A)(1), which required proof that Bailey trespassed in an occupied structure with purpose to commit a criminal offense in the structure, when another person was present. R.C. 2911.11(A)(1) also required proof that Bailey inflicted or attempted to inflict physical harm on another. Counts 7 and 8 alleged felonious assault in violation of R.C. 2903.11(A)(2), which required proof that

Bailey attempted to commit physical harm on another. The trial court merged Bailey's aggravated burglary conviction under R.C. 2911.11(A)(1) into the felonious assault convictions because they were committed with the same conduct and animus. As a result, the aggravated burglary conviction under R.C. 2903.11(A)(2) was eliminated for sentencing.

{¶27} The trial court also merged Counts 9 and 10 into Counts 3 and 4. Counts 9 and 10 alleged theft, in violation of R.C. 2913.02(A)(1). Counts 3 and 4 alleged aggravated robbery in violation of R.C. 2911.01, which required proof that Bailey brandished a gun during the commission of the theft. Again, because the thefts and aggravated robberies were committed in a single act and the same animus, the trial court merged these offenses. As a result, the theft convictions charged in Counts 9 and 10 were eliminated for sentencing.

{¶28} In its journal entry, the trial court stated that "Counts 1, 3, 4, 5, 6, 7, 8, 11, 12 and 15 do not merge." Counts 11, 12, and 15 alleged possession of criminal tools, having a weapon while under disability, and tampering with evidence. Bailey does not argue that Counts 11, 12, or 15 should have merged.

**Aggravated Burglary and Aggravated Robbery**

{¶29} Bailey argues his aggravated burglary conviction alleged in Count 1 of the indictment should have merged with his aggravated robbery convictions. In support of this argument, Bailey relies on *State v. Lacavera*, 8th Dist. Cuyahoga No. 96242, 2012-Ohio-800, in which this court held that Lacavera's aggravated burglary conviction

should have merged with his aggravated robbery, kidnapping, and felonious assault convictions. The evidence showed that Lacavera threw a 75 year-old woman down a flight of stairs during the commission of the robbery–burglary and caused her serious injuries.

{¶30} Lacavera was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1), which required the state to prove that he entered an occupied structure to commit a criminal offense (i.e. aggravated robbery) and caused or attempted to cause serious physical harm on another. *Id*. at ¶ 45. He was convicted of aggravated robbery in violation of R.C. 2911.01(A)(3), which required the state to prove that Lacavera inflicted or attempted to inflict serious physical harm on another while committing a theft offense. Therefore, Lacavera committed the aggravated robbery in the same act as the aggravated burglary.

{¶31} Bailey's aggravated robbery convictions under R.C. 2911.01(A)(1) had no physical harm requirement. R.C. 2911.01(A)(1) required proof that Bailey committed a theft offense while displaying or brandishing a deadly weapon. R.C. 2911.11(A)(1), which governs Bailey's aggravated burglary convictions, makes no mention of a deadly weapon. Both offenses involve separate acts and therefore fail to pass the first prong of the *Johnson* test and are not subject to merger.

**Aggravated Robbery and Felonious Assault**

**{¶32}** Bailey argues the aggravated robbery and felonious assault counts should have merged because they were committed within a single act or transaction and with the same animus. Once again, Bailey was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which states, in relevant part, that "[n]o person * * * committing a theft offense * * * shall * * * [h]ave a deadly weapon on or about the offender's person * * * and either display the weapon, brandish it, indicate that the offender possesses it, or use it." Actual physical harm is not an element of aggravated robbery under R.C. 2911.01(A)(1).

**{¶33}** Bailey was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which states that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon." In this case, Bailey threatened the victims by brandishing a firearm and threatened to kill them. In *State v. Brooks*, 44 Ohio St.3d 185, 192, 542 N.E.2d 636 (1989), the Ohio Supreme Court held that "[t]he act of pointing a deadly weapon at another, without additional evidence regarding the actor's intention, is insufficient evidence to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11(A)(2)." However, the act of drawing a firearm coupled with a threat to kill constitutes the "attempt" element of felonious assault even though the victim does not sustain a physical injury. *Id*. Therefore, it is possible to commit aggravated robbery under R.C. 2911.01(A)(1) while committing felonious assault under R.C. 2903.11(A)(2).

**{¶34}** However, the issue of whether two offenses are allied depends not only on whether the two crimes were committed in the same act, but also with a single state of mind. The Ohio Supreme Court has defined the term "animus" to mean "purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). Because animus is often difficult to prove directly, it may be inferred from the surrounding circumstances. When "an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, a priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime." *Id.*

**{¶35}** Thus, when determining whether two offenses were committed with a separate animus, the court must consider (1) whether the first offense was merely incidental to the second offense or whether the defendant's conduct in the first offense demonstrated a significance independent of the second, and (2) whether the defendant's conduct in the first offense subjected the victim to a substantial increase in the risk of harm apart from that involved in the second offense. *State v. Shields*, 1st Dist. Hamilton No. C-100362, 2011-Ohio-1912, ¶ 17.

**{¶36}** Bailey argues his aggravated robbery and felonious assault convictions should have merged pursuant to *State v. Lacavera*, 8th Dist. Cuyahoga No. 96242, 2012-Ohio-800. However, Lacavera was charged with aggravated robbery under R.C. 2911.01(A)(3), which required proof that he inflicted or attempted to inflict serious physical harm on the victim. His felonious assault conviction also required proof that he

actually caused serious physical harm to the victim. Thus both charges could be committed by the same act. Such is not the case here.

{¶37} Bailey was convicted of aggravated robbery because he committed a theft offense while displaying a deadly weapon. Several districts have held that where a defendant uses greater force than necessary to complete aggravated robbery, he shows a separate animus. *Id.* at ¶ 19 (defendant physically attacked the victim and "subjected [him] to a substantially graver harm than if he had merely displayed, brandished, indicated his possession of, or threatened to use" the weapon in the robbery, which constituted a separate crime). *See also State v. Ruby*, 6th Dist. Sandusky No. S-10-028, 2011-Ohio-4864, ¶ 61 (defendant had a separate animus when he assaulted victims because the beatings were not necessary to complete the theft offense); *State v. Diggle*, 3d Dist. Auglaize No. 2-11-19, 2012-Ohio-1583, ¶ 18 ("a defendant's excessive use of force is an indication of a separate animus").

{¶38} In this case, one of the gunmen hit Byrge with the barrel of a rifle to motivate him to find more money. The other gunman kicked Byrge in the head and caused injuries. These violent acts were not necessary to complete the robbery; the inherent threat from a deadly weapon was sufficient. *See Logan,* 60 Ohio St.2d at 131, 397 N.E.2d 1345. Therefore, the felonious assault against Byrge was not merely incidental to the aggravated robberies and therefore does not merge with the aggravated robbery conviction against Byrge.

{¶39} Similarly, the felonious assault and aggravated robbery counts committed against England are not subject to merger. The evidence showed that the defendants threatened England with the gun in order to restrain her during the robbery. However, the threat went beyond merely brandishing a weapon. The gunmen in her home threatened to kill her, knowing that she had two children in the home. They also told Byrge, who was nearby, that they were going to kill her. Although England did not sustain an immediate physical injury, the psychological harm she suffered cannot be dismissed as merely incidental to a robbery. Therefore, Bailey's felonious assault conviction committed against England does not merge with his aggravated robbery convictions.

**Kidnapping and Robbery**

{¶40} Bailey argues the kidnapping counts should have also merged with the aggravated robbery convictions because they were committed by a single act and with the same animus.

{¶41} Bailey was convicted of two counts of kidnapping in violation of R.C. 2905.01(A)(2), which states that "[n]o person, by force, threat, or deception, * * * shall * * * restrain the liberty of the other person * * * [t]o facilitate the commission of any felony *or flight thereafter*." (Emphasis added.) In *State v. Logan*, 60 Ohio St.2d 126,

397 N.E.2d 134, the Ohio Supreme Court established the following guidelines for determining whether kidnapping and another offense are committed with a separate animus:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus.

{¶42} Bailey and his accomplice restrained Byrge and England by ordering them to lie on the kitchen floor while aiming guns at them. They also restrained England's hands with zip ties and attempted to bind Byrge's hands with zip ties but his wrists were too big. Up until this point, the defendants restrained the victims to facilitate the commission of the aggravated robbery.

{¶43} However, the defendants ordered Byrge to remain in an interior hallway when they left the house. They also removed all cell phones and car keys from the home in order to thwart the victims' ability to call for help after the robbery was completed. These separate acts went beyond the robbery itself as evidenced by the fact that they did not steal any of the victims' cars and discarded the cell phones in the trash. These acts indicate an intent to prolong the restraint of the victims to facilitate flight after the

robbery was completed. England's hands were still bound together with zip ties after the defendants left the house, which further delayed the victim's ability to call the police. Therefore, because the defendants had a separate animus with respect to the prolonged restraint after the robbery was committed, the trial court properly refused to merge the kidnapping counts with the aggravated robbery counts.

{¶44} Accordingly, Bailey's third assignment of error is overruled.

## Ineffective Assistance of Counsel

{¶45} In the fourth assignment of error, Bailey argues he was deprived of his constitutional right to the effective assistance of counsel. Bailey contends his trial counsel was deficient for failing to file a motion to suppress Byrge's identification of him as one of the robbers and for failing to argue for merger of certain counts at sentencing.

{¶46} To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶47} Bailey argues his trial counsel was ineffective for failing to ask the court to merge his aggravated robbery convictions with both kidnapping convictions and the felonious assault convictions. However, these counts were not subject to merger for the

reasons explained in our discussion of the third assignment of error. Therefore, even if Bailey's trial counsel had requested merger of these counts, the outcome would still have been the same.

{¶48} Bailey argues his trial counsel should have filed a motion to suppress Byrge's cold-stand identification of Bailey. He contends Byrge's identification of Bailey was unreliable because he did not see Bailey's face during the robbery. He contends an identification based solely on tennis shoes, build, and race is not sufficiently reliable and is therefore unfairly prejudicial.

{¶49} Courts determine the admissibility of challenged identification testimony using a two-step process. First, the defendant must demonstrate that the identification procedure was unnecessarily suggestive. If the defendant meets this burden, the court must consider whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification. *State v. Page*, 8th Dist. Cuyahoga No. 84341, 2005-Ohio-1493. "Stated differently, the issue is whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure." *State v. Wills*, 120 Ohio App. 3d 320, 324-325, 697 N.E.2d 1072 (8th Dist.1997), citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

{¶50} In assessing the potential for misidentification, courts consider: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time

between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The court must review these factors under the totality of the circumstances. *Id.*

{¶51} Here, the incident lasted approximately six minutes during which Byrge had the opportunity to see the robbers' clothes, build, and general appearance. The suspects Byrge later identified matched the description he gave to police regarding their height, weight, race, and clothing. Byrge positively identified Kellum within 30 minutes of the robbery based on his unique Air Jordan tennis shoes. By all accounts, Byrge was confident they had found the right people when he made the identification.

{¶52} Although Byrge could not identify Bailey in the courtroom as the male he identified during the cold stand, an officer who witnessed the identification testified that he observed Byrge identify Bailey. That officer further testified that he recognized Bailey as the man Byrge identified. There was nothing to indicate that the identification procedure was unduly suggestive or unreliable and a motion to suppress the identification would have been denied. "The failure to do a futile act cannot be the basis for a claim of ineffective assistance of counsel, nor could such a failure be prejudicial." *State v. Knox*, 8th Dist. Cuyahoga Nos. 98713 and 98805, 2013-Ohio-1662, ¶ 20, citing *State v. Ford*, 8th Dist. Cuyahoga Nos. 88946 and 88947, 2007-Ohio-5722, ¶ 9.

{¶53} Therefore, the fourth assignment of error is overruled.

{¶54} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
TIM McCORMACK, J., CONCUR